May it please the Court, Matt Wessler for the appellants, Jacob and Jessica Beaty. There are two issues in this appeal. Whether Ford knew about the risk that its panoramic sunroofs could explode without warning, and whether the risk that these sunroofs would explode would have been material to a reasonable consumer under Washington law. The District Court granted summary judgment to Ford on both questions. On knowledge, it adopted a per se rule that a manufacturer's knowledge of a defect in one model cannot, as a matter of law, permit any inference about its knowledge of that defect for another model. And on materiality, it embraced another per se rule, this time that the risk of exploding sunroofs is not a fact that, as a matter of law, any reasonable consumer would consider material because the problem had yet to result in any deaths or serious injuries. Neither rule is correct. Both issues, a defendant's knowledge and the materiality of a particular fact, are virtually always reserved for the jury precisely because, as this case demonstrates, they involve fact-intensive issues that require the weighing of evidence, which is the quintessential function of the jury. On knowledge, there's little doubt that the District Court adopted an incorrect right-line rule, that it must be assessed model by model, because that is the rule that Ford asked the court to adopt. In its motion for summary judgment, it told the court that the only evidence of its knowledge of exploding sunroofs came from reports about its other model vehicles. But it argued that this evidence was irrelevant because, in Ford's words, knowledge of a defect in one model cannot, as a matter of law, establish knowledge of a defect in a different model. But that is not the rule. Instead, what matters is whether the defect is the same across models, not whether the models themselves are the same or different. And here, the defect is identical in every relevant way. As the Beatty's expert explained, every Ford panoramic sunroof, regardless of which model it's found in, contains the large, thin, curved, and weakened, thoroughly tempered glass that makes these sunroofs prone to spontaneous explosion. The District Court simply discounted this evidence. Instead, it credited Ford's expert's opinion that the different models of sunroofs contained size differences that were, in the court's view, significant. Excuse me, the expert's view was significant. But the weighing of competing expert opinions is exactly the function of a jury. And more to the point here, the Beatty's expert specifically rebutted Ford's view of those differences. And I'd like, I think, to point the court specifically to the record on this. It's at ER 289 and 290, where the Beatty's expert specifically said that, quote, While there are size variations among the sunroofs in different models, those differences don't matter because the defect is that all the sunroofs are larger than one half meter squared and employ a specific thickness of glass. That's the defect. And in the specific size differences that Ford's expert identified have nothing to do or have anything to say about that specific defect. In fact, Ford's expert conceded, and again, I'd like to point the court to the specific place in the record where this is true, ER 209 through 211, Ford's expert specifically conceded that both of these key features were the same for every car. Given this, court devotes most of its focus on appeal regarding its knowledge to an argument that it did not have knowledge of any, that it, in fact, did not have any knowledge of pre-sale sunroof explosions in any model of its vehicles. This argument, though, is a non-starter, and it's a non-starter for at least three different reasons. The first is that Ford not only didn't make this argument in any forum below. You can't find this argument in Ford's motion for summary judgment brief or in its reply, not even a passing reference to this argument. But it actually affirmatively conceded below that it did have pre-sale knowledge of these sunroofs exploding. And here, again, just to be specific, Ford, in its reply brief, specifically said that it had general knowledge of this issue, and it also told the court in its motion for summary judgment that its knowledge extended only to models other than the one that was at issue in this case. Ford seems to think that the problem is caused by getting hit by rocks, and I know that you think that that's wrong, but is this knowledge issue subjective? I mean, if they actually thought it was getting hit by rocks, would that be a problem for your knowledge? No. No, it wouldn't, Your Honor, and there are several reasons why that's true. The first is, of course, Ford never made that argument below either, didn't present it to the district court, so it's not just waived, but its concession of knowledge, I think, stops it from making this argument now. But even if you take the argument on its face, Ford received dozens, dozens of reports directly to it from consumers and also through NHTSA identifying this problem where it was told specifically that there was no impact. And I'll just be specific as an example, but there are dozens of the same kinds of reports. At ER 716 in the record is a report from a consumer directly to Ford, and this is what the report says. Sunroof just shattered while closed and sitting at stoplight. No impact. There are dozens of those kinds of reports that went directly to Ford, which don't permit it to rely in any meaningful way on this external strike theory. Even if, though you thought that the external strike theory was legitimate, again, that just raises what is a dispute of material fact that a jury should be able to resolve whether or not Ford was on sufficient notice by the time the babies, in this case, brought their vehicle. I'll also just add it's not just consumers that are raising this issue and saying it's not due to an external strike from a rock or some other debris. Dealers themselves are telling Ford the same thing. This is at ER 220. Again, presale report. This one to NHTSA in which a report says driving approximately 65 with sunroof closed and glass shattered. Nothing hit the roof. A dealer at ER 737 said much the same thing. The sunroof shattered. Quote, no impact noted. The dealer in that particular example actually expressed his own concern because he said, quote, I have a 2010 fusion with same concern. So I think that what this all points out is that even if you accept that Ford's new argument could be made on appeal, even though it wasn't presented below, wasn't passed on by the district judge and was affirmatively, which Ford affirmatively told the court that it did have the knowledge, this kind of issue would be a fact issue that should have been allowed to get to a jury. The district court short circuited that that approach or that step here because it thought that that that the only relevant knowledge could be model by model. But there's no authority in Washington law or anywhere else that suggests that that's true. In fact, as both the federal circuits and Washington state courts have said, what matters is whether the defect is the same across the line, not whether the models themselves have insignificant differences but don't relate to the specific people. If I could, I think I'd like to make just two more points on knowledge and then move to materiality. The other piece of knowledge, of course, is what happens with the NHTSA reports. Ford makes, I think, a great deal over what he claims to be a small number of reports that are being filed directly with it. Although we dispute the number, we think that it's more than 30. In addition to that, there are at least 20 NHTSA reports that Ford is charged with notice of automatically. And all those reports do the same thing as the reports that Ford received from consumers directly. And this is at ER 219 to 221. They are almost identical in the way that consumers are reporting to NHTSA, the same exploding summary. When you say charged with notice, is that a statutory rule? No, it's not a statutory rule, but manufacturers have an obligation to monitor the NHTSA system and recognize when reports are coming up for their vehicles. And NHTSA itself assumes manufacturers have knowledge of those reporting systems. So that sounds like it's by regulation? It is by regulation. In this case, for instance, NHTSA sent a letter to Ford requiring it to produce all of the reports, either from the NHTSA database or from itself, identifying exploding summaries as a problem for it to perform its investigation, which is still ongoing. But there are at least 20 of those specific complaints that went to NHTSA. And when you total it all up, you're somewhere in the range of 50 to 60 specific reports identifying exploding sunroofs before the babies even give out their car. That doesn't involve any of the hundreds of reports that Ford has received since 2012. On your expert's theory, would it even have to be a Ford car? I mean, it seems like his theory is that every sunroof on every car has this defect. Well, yeah, it's not – I wouldn't say it's every sunroof on every car, but it's those vehicles that use the panoramic sunroof manufactured by these – in the same way. The two manufacturers, though, so sorry, I maybe overstated a bit. But his theory would be you could look at a Volkswagen or some other car, right? Exactly. You could look at any of the vehicles that purchase the panoramic sunroofs from one of these two manufacturing companies and then install them in a unibody way, which is what Ford does and a number of the other manufacturers do as well. The defect has nothing to do with the specific nature of the car. It has everything to do with the size of the glass, the curvature of the glass, and the thickness of the glass as it comes from the factory. Now, again, whether a jury would believe, weigh the credibility of our expert versus Ford's expert, that the explosions can be explained by rocks, that's a fact question that the jury would be able to decide. But it's not appropriate for the district court here to have taken it away from the jury at summary judgment. The same is true of the district court's decision on materiality. And I'll just be brief here. What it did was it imported a standard that is applied to NHTSA for decisions that have nothing to do with materiality under Washington's consumer protection laws. And in so doing, it did violence to the way that Washington courts understand what it means for a fact to be material. A fact under Washington law to be material does not need to just involve matters of safety. Although we think that exploding sunroofs do implicate that issue, it is any fact that could negatively affect property in any way and would be material to a consumer, which just means that a consumer would attach importance to it. And the record is replete with evidence that consumers care about this issue. That comes not just from the plaintiff's evidence, but also from Ford as well, Ford's own expert. And this is if I can just find the site at 389 of the record. Ford's own expert acknowledges that when consumers are told about the likelihood that a sunroof will explode, that some consumers will care about that issue. Ford actually had an expert run a study asking consumers what issues they care about, and sunroofs were as important as a car's handling or driving. If you look at the record, the Beatys themselves testified in many different places, quite compellingly, that had they known about this problem, they wouldn't have purchased this car. This is not a crucial integral feature of every car. It is a luxury item. And consumers would be entitled to assess the potential risk of an exploding sunroof at 65 miles on the highway and decide to purchase a different vehicle. If I could just interject a reminder. Initially, you said you wanted to save four minutes for rebuttal. I appreciate that, Your Honor. I'll wrap up very quickly just to say that, like knowledge, materiality should have been allowed to reach a jury if the district court had applied Washington law's own understanding of how materiality works in the context of consumer protection claims. And I'll reserve the rest of my time to rebuttal. Thank you. And for your planning purposes, although you'll have a minute, ten seconds, we'll add an extra two minutes. Thank you, Your Honor. So we get three minutes. Now we'll turn to Mr. Garrett. Thank you, Judge Gould. And may it please the court, Nathaniel Garrett from Fuller Motor Company. I'd like to start where Mr. Wessler started, which was what was the basis for the district court's decision? It was not a per se rule. That's not what the district court held. It was a lack of evidence. And here's what the court said. Ford has demonstrated without rebuttal that there are significant differences between the escape PSR and the PSRs in other vehicles. The fundamental fact about this case is that plaintiffs failed to proper the kind of expert and lay testimony necessary to satisfy the substantial similarity test. And I would note that the substantial similarity test is derived, and that's the test the district court applied, is derived from the federal rules of evidence. And this court has traditionally given broad deference to district courts in ascertaining whether something is substantially similar. Mr. Wessler is also incorrect to suggest that the issue is the defect. I'll quote from the case they rely upon principally. That's the Jackson case out of the Fifth Circuit. Here's what Jackson held. It held that the substantial similarity test asked whether similar accidents occurred under substantially similar circumstances and involved substantially similar components. And the court explained that when you're talking about comparing two different products, the question is whether the products are relevant in all material. Excuse me, whether the products are substantially similar in all relevant respects. And here's the lack of evidence. Their expert, Thomas Reed, came forth in his initial initial expert report. He said there are five similarities between these PSRs, but he never investigated a single car. It's the same reason, frankly, this opinion was recently stricken under Daubert in another case. Same expert, same opinion. Because he never inspected any of the cars, and so he had no basis for this. Size, 0.5 meters is simply the definition of a panoramic sunroof. That's every panoramic sunroof. Thickness, 82% of the PSRs on the market are four millimeters thick. Ford's is five millimeters thick. So thickness is the issue. That applies to every single PSR on the market. It does seem that the expert's theory was that every panoramic sunroof is defective. So isn't that theoretically possible? Can you explain why the fact that it captures every panoramic sunroof means it's not permissible? Sure. Well, it's not that it's not permissible. I think that is their theory, frankly. I think their theory is that any piece of glass, because they don't distinguish. Mr. Wessler mentioned tempered glass. Their experts disclaimed any idea that it has anything to do with the form of the glass. So it's just any glass over 0.5 meters, which is the definition of a panoramic sunroof, used on a car is defective. Now, that's permissible if that's the theory they are retreating to. But the problem is it fails in numerous respects. Number one, the knowledge requirement here requires knowledge of a defect. But there's not a whit of evidence that Ford anticipated these glass PSRs were going to operate other than as intended. Now, I think there's some confusion on appeal because plaintiff's counsel and plaintiff's experts, I think, have different understandings of what the word spontaneous means. The counsel's argument is that spontaneous means it just happens without any reason, without any cause. You're sitting in the driveway and it can explode. But that's exactly contrary to what their experts do. You look at ER 288, Mr. Reed's rebuttal report. In rebuttal, he says, I want to be clear. My report focuses on the fact that the PSRs are exposed to environmental factors, including rocks and other road debris. The reason he's saying there can be spontaneous breakage is because those external forces can cause cracks or chips, and the break may occur after the initial impact. That was their expert's theory, that the break isn't always simultaneous. But even so, I mean, if it broke, so I understand you're saying no one's really been seriously injured. But just hypothetically, if a rock hit and the next week it broke in a way that caught the driver and that happened on every vehicle of every type of manufacturer with one of these sunroofs, couldn't that still be a defect? Sure, sure. It could be a manufacturing defect or a design defect. But here they haven't identified a single way in which Ford PSRs are any different from any other PSR. I mean, they talk about recalls. But I don't understand. I mean, I think you just said that it could be a defect on every car. So I don't understand. I'm not understanding your answer. OK, so my answer is twofold. Number one, Ford has to know about a defect. They have to know every case upon which they're relied is a case where the manufacturer had knowledge that something was wrong with the component. It wasn't going to operate as intended. And in your hypothetical, I think it's plausible that the PSR was not intended to break and cause cutting because the NHTSA regulations require certain safety. I mean, in that case, it's hard to imagine the PSR would satisfy NHTSA's safety standards. Here, we have PSRs that meet all the safety standards. And I don't want to fight the hypothetical, but you have 10 reports of cuts and scratches out of 1.5 million Ford vehicles on the road. But the point is that the knowledge prong isn't just knowledge. Of course, Ford knew the PSRs were made of glass. That was the intention. But where is the knowledge that if their theory is really so reductive as to be, this is the defect is that it's made of glass. Then Ford had no knowledge of something wrong. Number one. Number two, as we explained in the brief, this court has never allowed the substantial similarity standard to be reduced to that kind of level of generalization. And Daniel versus Coleman proves it right. In that case, Judge Fragerson's dissent said, look, we've got two heaters. It's enough that they both emit carbon monoxide because the purported defect is they can poison people to carbon monoxide. And the majority said, no, that's not good enough. There are differences here in the size, in the in the warnings. And so that's not close enough. So that's the second reason. And the third, Your Honor, is I struggle to see how materiality could be satisfied. If all Ford was expected to disclose was that the PSRs are made of glass because that's the. I do think it's important to note that there really is no dispute. Plaintiffs say this in their opening brief and back away and reply. There is no dispute that the differences between these panoramic sunroofs are not merely cosmetic. Our experts explain that there is a correlation between things like the size of the PSR and how horizontally, how much it's horizontal to the ground that can affect the rates. The problem here for plaintiffs is that the Ford Escape, which is the car we're dealing with, is tied for the lowest surface area of any of the cars. The lowest area of ceramic frit, which is another. Element that that plaintiff's expert said was substantially similar. And so not surprisingly, it has one of the lowest breakage rates among all the Ford vehicles and notably lower rates than the three investigations. And it has done and closed because they found no defect, including the Kia Sorento. How could we know as a matter of law, even assuming your percentages? And I take I think there's maybe some debate about what the percentage of how often this happens is. But even on your point, 05 percent, we have consumer surveys or any way to assess how consumers would think about this optional feature on a car, whether it's material or not for their decision. I think what we have, Your Honor, is a uniform is a body of law interpreting the same exact materiality standard that Washington used. Right. The Washington standard. Here's here's where I think the parties agree. The Washington standard for materiality broadly at its most broad level is a is a fact that a reasonable consumer would attach importance to in deciding whether to enter into a transaction. As the Supreme Court said in 2016, that is the materiality standard in every court. All of the cases in our brief, that's the standard in International Harvester, in the Thomas Ella, in Anderson, every single one of those acknowledges that. But they also acknowledge that omissions, pure omissions are different from affirmative misrepresentation. And so the question, I think, where we where we divide is whether it is against Washington law for a court to essentially put some meat on the bones, apply some sort of methodology to figure out whether something is material. Now, it is appropriate under Ninth Circuit law to interpret other states laws by looking at other jurisdictions as persuasive authority. And here we don't have any disagreements. We don't have, you know, courts saying your standards are on your standards wrong. They're just courts that are essentially giving judges ways to figure out when a pure omission is material. But what is the standard? How do we know that 0.05 percent isn't a level of risk that a lot of consumers would say, I'll take a car without the sunroof? Well, that's why I think, Your Honor, the court the court balanced the severity and the briefness. Right. Because, of course, auto parts break. If this court's ruling is 0.05 is enough in every scenario to get you past summary judgment. There is going to be a flurry of lawsuits because car parts do break and they get fixed. Right. But I think what the district court realized is that's a that's a low standard, whether in the abstract or lower than most other models and brands in the industry. It's just lower than you typically see. So if anything, this PSR is functioning better under plaintiff's theory than almost any other than other cars and brands in the market. And then you balance that against the severity. And so his point was, and I don't think plaintiffs have pointed to the case. There's no case where you have this low frequency and this low severity and it's material. If one of those changes we have the opposite, though, I mean, do we have cases saying in an optional feature this level is never material? Well, we have the Anderson case, which held that which was the exact same theory, exact same claim. And the court held that if this breakage doesn't occur at extremely high rate or at least at a rate significantly higher than other models in the industry, then it's not material. But, you know, again, it's not just materiality. It's it's it's knowledge. And one thing I haven't done, Judge Friedland has answered the question you asked before about if Ford believes this is occurring because of rock strikes, does that change the equation? And the answer is absolutely yes. It's absolutely yes, because the Washington standard for knowledge is actual subjective knowledge. And we know from cases like Coba out of the Third Circuit that the question is whether Ford had knowledge. Not just that something was happening, but that something was happening because of a defective reason. Right. And like in Coba here, Ford had a uniform consensus view that the cause was a non-defective reason. It was that rock strikes and other external forces can break the PSRs just like it can break a windshield. But why isn't there a fact dispute about that? I mean, it seems that many of the car drivers or the dealers they were taking them to were saying nothing ever hit them. Now, maybe you dispute that. But why isn't that a fact dispute? Well, because because your honor, the numbers were so low and it's consistent with both experts theory of how this class breaks. It's consistent in that what they were describing was not simultaneous impacts and impacts and breakage. But if you look at their expert reports, you won't find a single paragraph suggesting that there is something about the glass for the users that causes it to break it out. You won't find a single paragraph. But isn't it? I mean, if the reason is, you know, a small piece of hail hit or something, that would be a thing that would be expected to happen. And then over time, it propagates. And over time, then it causes the explosion. I mean, that could be a defect in a customer's mind, even if Ford might say, well, I thought that might happen. And that's normal, right? Like, why? I think that's because I think that's a different case, your honor, because it sounds it almost sounds like your honor's question is getting toward differences between types of glass. Right. In other words, some types of glass like laminated glass might break instantaneously, but then it could have sharp shards. Right. So car manufacturers make choices about what type of glass. But here there are experts disclaimed repeatedly the idea that the problem here is the type of glass. It was simply the existence of glass. It's the mere fact that they break when a steel roof, wooden steel roof, wooden that makes it a defect. And I would just go back to the point that that fails on multiple levels. Number one, Ford didn't have knowledge of anything defective about the PSRs. It knew they were glass. Number two, it's hard to imagine that the mere fact that a customer has a different understanding than Ford. I mean, Ford might think, OK, some of these are going to get hit in a way that's going to cause them to break. But the customer might think, I'm going to be able to drive this car without having an explosion in the glass fall on my head. And so I am struggling with what seems to be a disconnect in in the understanding of how this is supposed to work. Well, that's because, your honor, I think I think there's a difference between the knowledge prong and the materiality. I mean, on the knowledge prong, it really the question is Ford's knowledge, not what the customers expect. Right. So every case they're relying upon for this knowledge is cases where there was a defect in the product. It didn't operate as it was intended. But why does Ford get to decide what counts as a defect rather than the customer? Because they didn't sue for design defect. They sued under two causes of action for fraud, which require actual subjective knowledge. If they wanted to sue without, you know, without proving Ford's actual subjective knowledge, they had ways to do it and they declined to do so. So they are suing for fraud. And so if you're going to hold the manufacturer liable for fraud in the same way as if it had lied about the qualities, affirmatively lied about the qualities of its product, then, yes, you have to take the extra step to show that Ford understood there was a problem. Because otherwise you're holding a company liable for fraud without any sort of blame on its part that anything was going wrong. So this may be I know our court allowed things to be sealed and it's reasonable that you asked for things to be sealed, I think. But I am struggling a bit with the notion that you thought things needed to be sealed because somehow it would hurt the company to have more information out there about how often this was happening or how it was discussed. If really the idea here is there's no problem and no customer would be worried. Yeah. Yeah. So the ceiling was what is really motivated by is that these expert reports just provide details about the sunroofs, which is proprietary information. So plaintiffs are simply wrong that they're all the same. They have different curvatures. They have different sizes. They have they're attached to the bodies differently. I mean, there's a reference to unibody attachment to unibody frame. That's what cars are today. They use unibody frames. The body on frame is hardly used anymore, at least not the cars. So these are there. But there are differences in these PSRs. And so part of it is we're getting into the details of the characteristics of these PSRs. And that's the proprietary information we're most concerned about. Could they be redacted? Could that part be redacted? I think that the yes. And I think the there is a copy of redacted excerpts on. We have redacted and underreacted. But what I was concerned about is that I don't think it is just differences in cars. It's redactions of percentages of complaints and discussion of complaints and the very thing that seems to be an issue here. So it makes it a bit hard to discuss the core of the case, the things that are redacted. It seemed to go more to the core of the issues you're discussing than what your answer is. It sounds like maybe one resolution about your honor would be to go back to my client and see if we can narrow the redactions. Would that be appropriate? I think we may face that issue when we have to write an opinion, depending or disposition, depending on how this goes. So I think that might be necessary, but I don't want to speak for the panel. I'm not sure yet. I know I was worried about the CLP. Thank you, Judge Axel. I think the normal procedure following the case, like I am again speaking just for myself, might be that if the panel comes to an agreement on an opinion or opinions, I'm not certain that they're free of redacted material. We can send a sealed order to the parties attaching the opinion as an appendix before it's been filed publicly. Thank you, Your Honor. We're obviously at the court's disposal on that. If there are no further questions, I think it is the case that affirming plaintiff's theory here would mean that all car companies that have panoramics, they use glass in their roofs. That makes these particularly dangerous. And if anything, the rates of breakage are lower than the other models and brands in the industry.  Yes, thank you, Your Honor. I just have a few brief points, and Judge Fielden, I think you put your finger really just on it, which is that court does not get to control whether a jury determines that it had knowledge of a particular case by identifying in its own view what it thinks the problem is. That is not how knowledge works under Washington law. It is not how knowledge works under this court's cases. Instead, the way it works is if the plaintiff is able to put into the record evidence that consumers identified the particular issue to the manufacturer in a sufficient way to attract its awareness of the issue, regardless of whether or not ultimately there's a defect, that is sufficient to establish notice, at least for purposes of getting to a jury. And that's what we have here. Regardless of what court said about its view of whether this is a defect or not, there is ample record evidence that consumers identified this issue repeatedly to Ford, that the stun loops exploded on the highway, in the driveway, at night, stopped at a stoplight, across a range of different circumstances, most of which had nothing to do with rocks or other debris. Dealers and NHTSA did the same thing. On materiality, what court is asking this court to do is to impose a specific standard on materiality that does not exist under Washington law. And that I respectfully suggest is not this court's job. This court's job is to take Washington law as it is. And the Washington courts have defined materiality very broadly to include a whole range of facts that could affect a consumer's decision in purchasing a product, not just facts that go to safety or somehow threaten a consumer's life, but that in any way adversely affect the property or the product. That includes, for instance, the Griffith case, which involved a defective siding on a house. That is as broad as materiality gets, and it's covered here in exactly the way that we have said it is. And were this court to adopt one of Ford's four different tests, it would be adding a particular requirement that Washington law itself does not impose. I think just to sum it all up, what you've heard from Ford could be a very effective closing argument in front of a jury. Ford has its own experts. It believes those experts are right about the problem. Ford has a view about what defect exists here or what defect doesn't exist here. It is entitled to make that argument to a jury, but so are the plaintiffs. And the plaintiffs have their own expert who has come up with a specific, identified a specific defect, regardless of how broad that defect is, regardless of whether it applies to other car manufacturers. If an engine explodes in Dodge cars and it also explodes in Ford cars, that doesn't mean that Ford is capable of concealing that fact from consumers. It means that there's a defect that is broader than just one manufacturer. But this case should have been allowed to reach a jury. The record is riddled with factual disputes that are exactly what the jury should have been able to consider in the district court. By taking it away from the jury committed to clear legal errors in this court should be reversed. I'm interested, if you don't mind, in a quick response to Mr. Garrett's point about how you did not bring a product defect case, but you brought a fraud case. And so can you just address that for me, please? Sure. The Washington Consumer Protection Act, this is exactly the kind of claim that the CPA covers. It includes both fraudulent concealment and omission. And it directly regulates and restricts manufacturers from concealing material facts like the one at issue here from consumers when making their purchasing decisions. Now, there was a warranty claim in this case, but the district court dismissed it on a motion to dismiss, and it hasn't been appealed. And so this case, as this court takes it, is just under the Washington CPA and fraudulent concealment under common law. And that's the body of law that should apply in evaluating both knowledge and materiality. Would the standard for defect be the same as a defective product under the provisions that you are suing under? So, no, it's broader under the claims that we have at issue here. The CPA itself doesn't define defect and, in fact, doesn't even require a defect. All it requires is that a manufacturer or defendant somehow deceptively conceal a particular fact from the purchaser. So, defect is actually not an element of the claim, although here our theory of the case is that what Ford concealed was the defect that is inherent in the countering assignment. So you chose to plead it as a defect, so if you can't show a defect, you're going to lose on your fraud claim, even though you could bring, in theory, a fraud claim under the Washington statute, even if what you were saying should have been disclosed was not a defect per se, but similar to, you know, where here we're going to tell you that windshields sometimes break, something like that. Yes, the Washington law covers a whole broad range of deceptive conduct. It doesn't necessarily require a defect, but here Ford will be entitled to argue to the jury that there's nothing inherently wrong with its product and, as a result, it was not deceptive in any way. But that's a jury question, and the jury should have been in a position to be able to assess that. Unless the court has any further questions. Any questions? I think the panel has no questions. Just finally, I want to thank Mr. Wessler and Mr. Garrett for your advocacy for your clients, and we really do very much appreciate your making this effort to argue remotely. At this point, the Beatty v. Ford Motor Company case shall be submitted, and the parties will hear from the panel in due course. Thanks. Thank you, Your Honor.
judges: Gould, Friedland, Ericksen